STATE OF NEBRASKA, APPELLEE, V.
L.T. THOMAS, APPELLANT.
637 N.W.2d 632

Filed January 11, 2002. No. S-00-1070.

James Walter Crampton for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, and MILLER-LERMAN, JJ.

WRIGHT, J.

## I. NATURE OF CASE

L.T. Thomas was convicted of second degree murder, first degree assault, and two counts of use of a firearm to commit a felony. Following his conviction, Thomas filed a motion for new trial and two supplemental motions for new trial, all of which were overruled. Thomas was sentenced as a habitual criminal.

Thomas' direct appeal was dismissed because the poverty affidavit was signed by trial counsel rather than by Thomas. In response to a motion for postconviction relief, Thomas was granted a new direct appeal because trial counsel had provided ineffective assistance in filing the original direct appeal. Thomas' appeal from the postconviction proceedings was dismissed by this court upon the State's motion for summary dismissal. The matter is presently before this court on Thomas' new direct appeal.

## II. SCOPE OF REVIEW

■ In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for

the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Quintana*, 261 Neb. 38, 621 N.W.2d 121 (2001).

In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998).

### III. FACTS

On June 17, 1994, Thomas shot two men who were in a car near the Stage II lounge in Omaha, Nebraska. Phillip White, the driver, was shot in the left leg, and Rafael Petitphait, a passenger, was shot in the back, head, and left leg.

Following the shooting, White drove away at a high rate of speed. Shortly thereafter, the car ran over a curb and into a brick building at 24th Street and Patrick Avenue. White died of head injuries sustained in the automobile accident.

Prior to the shooting, Thomas met Demitrius Simpson and Russell Wills at the Stage II lounge. The group left the lounge and were standing near Thomas' car when a fight broke out between two women. Simpson attempted to stop the fight because he knew one of the women. White and Petitphait were among the crowd that gathered in the parking lot outside the lounge. As Petitphait also attempted to stop the fight, he was struck by a man who was later identified as Simpson. Petitphait stopped White from going after Simpson because White had a .22-caliber gun, which he always carried with him. The gun was not operational, Petitphait said.

After the fight, some of the bystanders teased Petitphait about not fighting back. Petitphait approached Simpson, and the two began to fight. Simpson said he was attacked by several of Petitphait's friends. Petitphait testified that he kept hitting Simpson until someone pulled him off. At some point in time, shots were fired into the air, and the crowd began to disperse.

Thomas testified that he was grabbed during the fight between Petitphait and Simpson and that someone pointed a gun at his head. As Thomas ran away, he heard shots fired. Thomas moved

his car out of the parking lot, took his gun out of the trunk, and walked back to the scene of the fight. A car approached, and Thomas heard Petitphait say, "Blood, smoke that nigger." Thomas claimed that the driver waved a gun. Thomas testified that he ducked and then stood up and started shooting in self-defense.

Petitphait testified that as he and White were stopped at the traffic light at 30th and Bedford Streets, they heard gunshots coming from the rear of the car. When White realized Petitphait had been shot, he said he was going to drive to a hospital. As they drove away, White said he had also been shot. Shortly before the crash, White said he could not make it to the hospital. The car hit a curb and then crashed into a building. A gun was found on the floor of the driver's side of White's car. Testimony was presented to establish that White was speeding and that he was intoxicated.

Thomas was charged with first degree murder, first degree assault, and two counts of use of a firearm to commit a felony in the commission of the above felonies. An amended information was filed alleging that Thomas is a habitual criminal.

During jury selection, the State asked the panel if any prospective juror's family had ever been a victim of a violent crime or a crime in general, or if any prospective juror knew anyone (friend, family, or acquaintance) who had been a victim of a homicide. Some of the panel members responded affirmatively and were further interrogated by the State.

Thomas was subsequently convicted of second degree murder, first degree assault, and two counts of use of a firearm to commit a felony. After an enhancement hearing, Thomas was found to be a habitual criminal. He was sentenced to prison terms of 20 years to life for second degree murder, 12 to 14 years for use of a firearm to commit second degree murder, 12 to 14 years for first degree assault, and 10 to 12 years for use of a firearm to commit first degree assault. The sentences were ordered to be served consecutively.

Thomas timely filed a motion for new trial. He subsequently filed two supplemental motions for new trial and requested an evidentiary hearing before a neutral judge. The trial judge overruled the first two motions, and a different judge overruled the third motion.

A review of the three motions for new trial is necessary. In the first motion for new trial, Thomas alleged, inter alia, that the proceedings were irregular because no African-Americans were included in the panel from which his jury was selected. He also claimed that the prosecutor made improper remarks in closing arguments when he commented to the jury: "We all should be sick and tired of the shooting, the random shooting that goes on and the violence that's going on. Now you have a chance to do something about it."

Thomas' first supplemental motion for new trial alleged that Thomas had learned from Vincent Evans, a previously unidentified witness, that testimony about the shooting given by William King, Jr., one of the State's witnesses, was not true. Thomas alleged that King's testimony was crucial to the State's case and that King had refused to identify any other witnesses who were present with him. Thomas alleged that Evans' testimony about the shooting would have contradicted King's testimony.

Thomas' second supplemental motion for new trial and request for an evidentiary hearing before a neutral judge alleged that during the second day of deliberations, the jury foreman sent a note to the trial judge stating that the jury was deadlocked. Outside the presence of and without notice to the parties or their counsel, the trial judge told the jury to continue deliberating because it was too soon to abandon the effort to reach a verdict.

At a hearing to consider the first two motions for new trial, Thomas clarified that the supplemental motions were not intended as new motions for new trial but were intended to be considered part of the original motion. The trial judge recused himself on the claim of improper communication with the jury, and the parties proceeded to argue the remaining issues. Thomas asked the trial court to take judicial notice that there were no African-American jurors and that no African-Americans were included in the jury panel. Thomas also alleged juror misconduct based on a letter from one of the jurors, who stated that she wanted to change her vote, and another juror's statement that the jury did not follow the instructions given by the trial court. Thomas offered into evidence sworn statements from these jurors.

In exhibit 105, a jury member (Juror A) stated that while the jury was discussing whether the crime was first or second

degree murder, another jury member (Juror X) was adamant that the crime was first degree murder. Juror X said that he knew in his heart that a person would not return to the area of the shooting unless he was looking to kill someone. Eventually, the jury learned that Juror X had an uncle who had been shot by a relative and that Juror X believed that the relative should have been convicted of first degree murder, rather than second degree murder. When the foreman asked Juror X why he did not disclose this information during jury selection, Juror X stated that he did not believe it was important enough to mention.

Exhibit 106 is a sworn statement from another jury member (Juror B) claiming that the jury did not follow its instructions with regard to reasonable doubt. Exhibit 108 is a letter from Juror B to the trial court stating that the juror wanted to change her vote. The State objected to the exhibits, and the trial court took the matter under advisement. The closing argument at trial was also offered and received into evidence. Thomas offered exhibit 107, which is a sworn statement by Evans, the previously unidentified witness. The State objected to admission of Evans' statement. The record does not indicate whether Evans' statement was received.

The trial court overruled the first two motions for new trial. In its written order, the trial court found that Thomas raised three issues in the motions—newly discovered evidence, recantation of the verdict by two jurors, and improper statements by the prosecutor in closing argument. The trial court noted that the basis of Thomas' claim of newly discovered evidence was an affidavit by Evans, who was with King at the time of the shooting. When King testified during the trial as to his observations of events related to the shooting, King acknowledged that he had a companion at the time but he declined to name the companion, and neither party asked the trial court to require King to identify the companion.

Although Evans' account differed from King's testimony as to the pair's activities prior to and after the shooting, the trial court found that Evans' testimony could have been produced at trial with reasonable diligence and did not provide a basis for new trial.

In addressing the alleged juror misconduct, the trial court reviewed the statement of Juror B, who alleged she wanted to change her vote. The trial court found that the letter concerned

matters occurring during the course of the jury's deliberations, matters influencing the juror to assent to the verdict, and the juror's mental process in connection with the deliberations. The trial court refused to receive Juror B's sworn statement, and its contents were not considered by the court in its rulings on Thomas' motion for new trial and the first supplemental motion.

The trial court noted that a sworn statement from Juror A also alleged factors that influenced the juror to assent to the verdict. The court refused to admit exhibit 105, which recapitulated statements occurring during the jury's deliberations.

The trial court found that Thomas had timely objected to the prosecutor's remark about random shootings and asked for a cautionary instruction or, in the alternative, a mistrial, which the court refused. The trial court had instructed the jury that it should be governed solely by the evidence and should not be influenced by statements of counsel not supported by the evidence. The court paraphrased a witness at trial who had testified that he was sick and tired of the guns and the shooting and that someone had to do something about it. The trial court stated: "In the light of the cautionary instructions given and the testimony at trial, I do not think that the prosecutor's language reached a degree of prejudice which could not be avoided by the usual admonitions to the jury." The trial court overruled Thomas' motion for new trial and the first supplemental motion.

The trial judge then recused himself, and a hearing was held before a different judge to consider whether the trial judge gave the jury an improper *Allen* charge. See *Allen v. United States,* 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896). Thomas offered the sworn statement of Juror A to demonstrate that communications occurred between the trial court and the jury. The second judge received into evidence part of Juror A's statement, but the judge found no prejudice to Thomas by the conduct alleged in the statement. The second judge found that the trial judge had merely told the jurors to continue deliberating. Thomas' second supplemental motion for a new trial was overruled.

## IV. ASSIGNMENTS OF ERROR

Thomas assigns 20 errors, which we have restated. Concerning jury issues, Thomas alleges that he was denied a fair trial by the

misconduct of Juror X, who failed to indicate during voir dire that his uncle had been a victim of a violent crime, and that the jury considered this information during deliberations; by the jury's consideration of facts not in evidence related to Juror X's misconduct; by the jury's failure to follow the instructions as to burden of proof and the order of consideration; and because the jury panel was not reflective of the racial diversity of the community. Thomas also asserts that the trial court erred when it failed to protect his right to a fair trial after the court learned of Juror X's misconduct; when the court instructed the jury to continue deliberations; when the court failed to make a record concerning receipt of a note from the jury; and when the court failed to properly instruct the jury that it could not change its decision after a verdict and failed to properly instruct on proximate cause, manslaughter, and self-defense. The second judge abused his discretion when he improperly overruled Thomas' second supplemental motion for new trial on the ground of jury misconduct.

Thomas alleges several errors related to prosecutorial misconduct. He asserts that he was denied a fair trial when the prosecutor made an agreement with a witness in exchange for testimony helpful to the State and failed to disclose the agreement to the jury, used improper rebuttal to bolster a witness' credibility, made improper statements during closing argument, struck from the jury the only minority member of the jury panel, and presented improper rebuttal evidence on identity when identity was not an element of the defense.

As to evidentiary issues, Thomas asserts that the trial court erred in refusing to allow cross-examination of a witness as to his address after the State asserted that the witness feared retaliation even though no evidence of the alleged fear of retaliation was adduced, in allowing improper rebuttal evidence on identity when identity was not an element of the defense, in admitting expert opinion testimony on "crush measurements" and impact calculations, and in finding Thomas to be a habitual criminal.

Thomas asserts that he received ineffective assistance of counsel when trial counsel failed to call a witness who would have impeached the credibility of other prosecution witnesses, failed to object to expert opinion testimony on crush measurements and impact calculations, failed to file a motion in limine

to exclude testimony related to an injury to White's leg, failed to identify and compel to testify a witness who was with one of the State's witnesses, failed to object to the causation instruction and to prepare an alternate proximate cause instruction, failed to offer a manslaughter instruction, failed to elicit the testimony of the trial judge and bailiff at the hearing on the second supplemental motion for new trial, failed to object to exhibits related to the habitual criminal allegations and to preserve the issue on appeal, and failed to move to strike testimony of witnesses who refused to answer material questions on cross-examination.

The last errors asserted relate to postconviction issues. Thomas alleges that the district court erred in failing to follow appropriate postconviction procedures, in failing to grant an evidentiary hearing, and in failing to find that the convictions were void or voidable.

## V. ANALYSIS

### 1. ISSUES BEFORE THIS COURT

We must first address the State's assertion that some of the issues raised by Thomas and some portions of the record are not properly before the court in this new direct appeal. The State questions whether exhibits 105 and 106, sworn statements from Jurors A and B, can be considered on direct appeal because the exhibits were not offered at trial, but, rather, were offered during the hearing on Thomas' motion for new trial and the first supplemental motion. The trial court did not receive the exhibits into evidence and overruled those motions. The State seems to argue that the overruling of the motion for new trial and the first supplemental motion was a separate appealable order and that because Thomas did not file an appeal from that order within 30 days as required by Neb. Rev. Stat. § 25-1912 (Cum. Supp. 1994), this court cannot consider the exhibits as a part of the record.

In support of its argument, the State relies on *State v. McCracken*, 248 Neb. 576, 537 N.W.2d 502 (1995) (*McCracken I*), in which we stated that a party who timely files a motion for new trial may appeal from the overruling of that motion provided that the party complies with the 30-day filing requirement of § 25-1912(1). We stated that the denial of a motion for new trial

is a separate proceeding from an order entering a judgment. "A party may be able to preserve for appellate review issues which are presented to the district court in a timely filed motion for new trial although he failed to file a timely notice of appeal from the judgment entering the verdict and sentence." *McCracken I*, 248 Neb. at 580, 537 N.W.2d at 505, citing *State v. Nash*, 246 Neb. 1030, 524 N.W.2d 351 (1994), and *State v. McCormick and Hall*, 246 Neb. 271, 518 N.W.2d 133 (1994). Both *McCracken I* and *McCormick and Hall* dealt with motions for new trial based on claims of newly discovered evidence. In *McCormick and Hall*, the motions for new trial were decided more than 2 months after sentencing. In *McCracken I*, the motion for new trial was based upon errors in sentencing, although McCracken had not yet been sentenced. Thomas' first motion for new trial made no claim concerning newly discovered evidence, but the supplemental motions raised such claims.

■ We have also held that when considering the merits of a new direct appeal, an appellate court is precluded from considering any portion of the record that would not have been included in the record on the original direct appeal. See *State v. McCracken*, 260 Neb. 234, 615 N.W.2d 902 (2000) (*McCracken II*).

The State's reliance upon *McCracken I* and *McCracken II* (and the cases from which they were derived, *McCormick and Hall* and *Nash*) is misplaced. In certain circumstances, a motion for new trial based on newly discovered evidence can be separately appealed from the judgment of conviction and sentence because a motion for new trial based on newly discovered evidence need not be filed and ruled upon within 30 days of the sentence. Newly discovered evidence can be the basis of a motion for new trial if it is discovered within 3 years after the verdict. Thus, the ruling on such a motion would necessarily be appealed separately from the conviction and sentence. See Neb. Rev. Stat. § 29-2103 (Reissue 1995).

Section 29-2103, as it relates to newly discovered evidence, is not applicable here. Thomas' original motion for new trial was filed within 10 days of the verdict. The additional motions for new trial supplemented the timely filed original motion for new trial. We therefore conclude that the record made by Thomas at

the hearings on his motions for new trial may be considered by this court on the new direct appeal.

■ In a criminal case, errors assigned by the defendant based on the overruling of a timely filed motion for new trial may be assigned as error in a properly perfected direct appeal from the judgment. To the extent that *McCracken I*, *McCracken II*, *McCormick and Hall*, and *Nash* could be interpreted to the contrary, such interpretation is expressly disavowed. It would be a waste of judicial resources to require a defendant who has timely filed a motion for new trial within 10 days of the verdict to file two appeals: one from the order overruling the motion for new trial and a second from the judgment which occurs when the sentence is pronounced. In order to provide for one appeal, the trial court should rule on all outstanding motions prior to sentencing. Other than the exceptions stated in § 29-2103, alleged errors in overruling a timely filed motion for new trial should be assigned and considered on direct appeal.

## 2. JURY ISSUES

Thomas alleges a number of errors related to the jury, including juror misconduct. Thomas asserts that he was denied a fair trial by the misconduct of Juror X, who failed to disclose during voir dire that his uncle had been the victim of a violent crime, and Thomas alleges that the jury considered facts not in evidence related to Juror X's misconduct.

The State claims Thomas has failed to prove juror misconduct because the sworn statements of two jurors should not be before this court. The issue of juror misconduct was presented to the trial court in the second supplemental motion for new trial. As noted above, that record is properly before us.

■ In order for jury misconduct to become the basis for a new trial, it must be prejudicial. *State v. Rust*, 223 Neb. 150, 388 N.W.2d 483 (1986), *cert. denied* 481 U.S. 1042, 107 S. Ct. 1987, 95 L. Ed. 2d 826 (1987). Where the jury misconduct in a criminal case involves juror behavior only, the burden to establish prejudice rests on the party claiming the misconduct. *State v. McDonald*, 230 Neb. 85, 430 N.W.2d 282 (1988).

"When an allegation of misconduct is made, and is supported by a showing which tends to prove that serious

misconduct occurred, the trial court should conduct an evidentiary hearing to determine whether the alleged misconduct actually occurred. If it occurred, the trial court must then determine whether it was prejudicial to the extent the defendant was denied a fair trial. If the trial court determines that the misconduct did not occur, or that it was not prejudicial, adequate findings should be made so that the determination may be reviewed.

"The matter of whether the misconduct occurred is largely a question of fact and the jurors may be questioned as to what happened during their deliberations. The determination as to whether the misconduct was prejudicial to the extent that the defendant was denied a fair trial is a question for the trial court which is to be resolved upon the basis of an independent evaluation of all the circumstances in the case."

*Id.* at 95, 430 N.W.2d at 289.

This court has previously considered the parameters under which a juror may testify concerning extraneous information which was improperly brought to the jury's attention during deliberations. No evidence may be received concerning the effect of any statement upon a juror's mind, its influence upon the juror, or the mental processes of a juror. See, *State v. McDonald, supra*; *State v. Roberts*, 227 Neb. 489, 418 N.W.2d 246 (1988); *State v. Steinmark*, 201 Neb. 200, 266 N.W.2d 751 (1978). The evidentiary hearing may be conducted as part of a hearing on a motion for new trial. *State v. McDonald, supra.*

The issue of juror misconduct was presented to the trial court in Thomas' second supplemental motion for new trial and was raised at the hearing on the motion. Evidence of the alleged misconduct was offered through the jurors' sworn statements. The trial court declined to consider those exhibits and subsequently overruled Thomas' second supplemental motion for new trial.

In excluding the jurors' statements, the trial court relied upon Neb. Rev. Stat. § 27-606(2) (Reissue 1995), which provides:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from

the verdict or indictment or concerning his mental process in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him indicating an effect of this kind be received for these purposes.

To resolve this issue, we must interpret § 27-606(2). Statutory interpretation presents a question of law, in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *In re Guardianship & Conservatorship of Garcia, ante* p. 205, 631 N.W.2d 464 (2001).

Under § 27-606(2), a juror is prohibited from testifying about any matter or statement which occurred during the jury's deliberation, with two exceptions: whether extraneous prejudicial information was brought to the jury's attention and whether any outside influence was brought to bear upon any member of the jury. Section 27-606(2) restricts the evidence that a court can consider in determining whether juror misconduct occurred. The key phrase in the statute is "extraneous prejudicial information," and within that phrase, the crucial word is "extraneous," which means " 'existing or originating outside or beyond: external in origin: coming from the outside . . . brought in, introduced, or added from an external source or point of origin.' " See *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 455, 412 N.W.2d 56, 77 (1987), and Webster's Third New International Dictionary, Unabridged 807 (1993).

No evidence was presented in this case which established that any extraneous information was brought to the jury's attention. One of the statements indicated that Juror X had informed the jury that he had an uncle who had been murdered and that the perpetrator had been found guilty of second degree murder. This information was provided by a member of the jury, not by an external source. The second juror statement asserted that the jury did not follow instructions during its deliberations. Again, no outside information was introduced. In *Hunt v. Methodist Hosp.*, 240 Neb. 838, 485 N.W.2d 737 (1992), we allowed juror

affidavits only to show that presubmission discussions took place among certain jurors over 5 days of the 7-day trial. Other comments in the affidavits were found to be useless.

 We conclude that the trial court properly excluded the jurors' statements based upon the court's interpretation of § 27-606(2). None of the jurors brought extraneous information to the jury or obtained extra information about the facts of the case. The allegations in Juror A's sworn statement concerned Juror X's personal feelings about the murder of his uncle and claimed that Juror X was insisting on a verdict of first degree murder. This evidence was not admissible. Section 27-606(2) does not allow a juror's affidavit to impeach a verdict on the basis of jury motives, methods, misunderstanding, thought processes, or discussions during deliberations. *Rahmig v. Mosley Machinery Co., supra.* Where the jury misconduct in a criminal case involves juror behavior only, the burden to establish prejudice rests on the party claiming the misconduct. *State v. McDonald,* 230 Neb. 85, 430 N.W.2d 282 (1988). In a criminal case, the misconduct must be demonstrated by clear and convincing evidence. See *Hunt v. Methodist Hosp., supra.* Thomas has not sustained his burden of proof that juror misconduct occurred or that the jury considered facts not in evidence related to juror misconduct. This assignment of error is without merit.

Thomas also claims that the jury failed to follow the trial court's instructions as to burden of proof and the order of consideration in deliberations. He relies on the jurors' sworn statements for support. Because we have found that the statements were properly excluded, we find no merit to this assigned error.

Thomas next asserts that the trial court erred and failed to protect Thomas' right to a fair trial when the court instructed the jury to continue deliberations after the court was made aware of Juror X's deception and when it failed to make a record concerning receipt of a note from the jury. Thomas asserted that the directive from the trial court to a deadlocked jury amounted to an improper *Allen* charge (directive from court to deadlocked jury to keep deliberating). See *State v. Owen,* 1 Neb. App. 1060, 510 N.W.2d 503 (1993).

 An *Allen* charge to the jury given orally without notice to the parties or their counsel violates Neb. Rev. Stat.

§§ 25-1115 and 25-1116 (Reissue 1995) and is improper. See *State v. Owen, supra.* The State has the burden to prove that the defendant was not prejudiced by any improper communication between the judge and the jury. *Id.*

At the evidentiary hearing, a different judge received into evidence the juror's statement which described the trial judge's communication directing the jury to continue its deliberations. Thomas argued that if he had known of the jury's note, he would have asked the trial judge to allow the jury to return a hung verdict rather than ordering the jury to proceed. The second judge overruled the second supplemental motion for new trial, finding no prejudice to Thomas and holding that the trial judge had merely directed the jury to continue deliberating.

If the record affirmatively shows that the defendant has been prejudiced by private communication between the trial court and jurors, it is reversible error, and a new trial should be granted. Reversal is not required if the record affirmatively shows communication had no tendency to influence the verdict. See *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998).

The record shows that the communication between the trial court and the jury merely directed the jury to continue its deliberations. This direction did not have a tendency to influence the verdict. This assignment of error is without merit.

Thomas' next assertion related to the jury is that he was denied a fair trial because the jury panel was not reflective of the racial diversity of the community. At trial, Thomas' attorney asked for an evidentiary hearing pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), because the sole panel member who was a member of a minority group, a Native American, had been stricken from the panel by the State. The State advised the trial court that it had prosecuted a case the previous summer which involved persons believed to be related to the Native American juror and that it was therefore prudent to strike the juror in this case.

After Thomas moved to disqualify the all-white jury panel, the trial court held an evidentiary hearing. Although Thomas said he was not abandoning his *Batson* challenge, he did not offer any evidence. The clerk of the district court testified that the selection of jury panels is a random process and is not

related to the minority status of the defendant. The trial court overruled the motion to disqualify the panel.

A defendant must satisfy certain criteria in order to establish a prima facie case of discrimination in jury selection. If the defendant establishes such a prima facie case of discrimination, then the burden shifts to the State to articulate a neutral explanation for striking any juror.

██ In examining whether an entire jury should be stricken due to racial composition, we stated in *State v. Garza*, 241 Neb. 934, 952-53, 492 N.W.2d 32, 45-46 (1992):

> In *Duren v. Missouri*, 439 U.S. 357, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979), the U.S. Supreme Court observed that in order to establish a prima facie violation of the fair-cross-section requirement under the Sixth Amendment, a defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community, (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.
>
> . . . .
>
> We have consistently held that a defendant has no right to a petit jury composed in whole or in part of members of his or her race, *State v. Pratt*, 234 Neb. 596, 452 N.W.2d 54 (1990); *State v. Venable*, 233 Neb. 309, 444 N.W.2d 907 (1989); *State v. Kitt*, 231 Neb. 52, 434 N.W.2d 543 (1989), and that the absence of members of the defendant's race in the jury, standing alone, does not support a claim of improper racial composition, *State v. Falkner*, 224 Neb. 490, 398 N.W.2d 708 (1987). A defendant cannot, under either a Sixth Amendment or an equal protection challenge, simply allege that no minorities are on the jury, but has the burden of establishing systematic exclusion and purposeful discrimination.

The State established here through cross-examination of the clerk of the district court that permissible racially neutral selection criteria and procedures were used which produced the monochromatic result in Thomas' case. The evidence showed

that at least 6 African-Americans were included in the 144 persons called for jury duty. From that group, the venire panel of 50 to 60 members was selected on a random basis without reference to race or the race of the defendant being tried. Nothing in the record established that the six African-Americans called for jury duty were purposely excluded from the panel from which Thomas' jury was selected.

Thomas claims *Garza* is distinguishable because "the odds ... are astronomical" that an entire panel will not include any African-Americans. See brief for appellant at 27. In support of his motion to disqualify the jury panel, Thomas offered as evidence an exhibit showing that African-Americans make up 10.94 percent of the Douglas County population and an affidavit stating that he is of African-American descent but that no members of the jury panel were African-American. The clerk of the district court testified about the jury panel selection process and explained that it is random. Prospective jurors' cards are separated into piles for each courtroom holding a jury trial. Although other African-Americans were called for jury service, none were randomly selected for the jury panel which heard Thomas' case. Thomas' evidence did not establish any error in the process by which the panel was selected, and he has not shown that any underrepresentation was due to systematic exclusion.

The trial court's findings that there was no discrimination in the selection of the jury are not to be reversed on appeal unless clearly erroneous. *State v. Venable*, 233 Neb. 309, 444 N.W.2d 907 (1989). Thomas has failed to meet his burden of proving that he was denied a fair trial because the jury panel was not reflective of the racial diversity of the community. We find no error by the trial court.

Thomas next claims that the trial court erred in its instructions to the jury. He alleges that the trial court failed to give an appropriate proximate cause or manslaughter instruction or to give a correct self-defense instruction. Thomas also alleges that the trial court should have instructed the members of the jury that they could not change their minds after the verdict was entered.

In an appeal based on the claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected

a substantial right of the appellant. *State v. Greer*, 257 Neb. 208, 596 N.W.2d 296 (1999). It is the duty of a trial judge to instruct the jury on the pertinent law of the case, whether requested to do so or not, and an instruction or instructions which by the omission of certain elements have the effect of withdrawing from the jury an essential issue or element in the case are prejudicially erroneous. *State v. Dixon*, 259 Neb. 976, 614 N.W.2d 288 (2000).

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Brown*, 258 Neb. 330, 603 N.W.2d 419 (1999). A trial court is not obligated to instruct the jury on matters which are not supported by evidence in the record. *State v. Urbano*, 256 Neb. 194, 589 N.W.2d 144 (1999).

The trial court gave the proximate cause instruction requested by Thomas. The instruction stated: "The defendant killed Phillip White if the death of Phillip White occurred in a natural and continuous sequence and without the defendant's act, the death of Phillip White would not have occurred." This instruction is similar to the definition of proximate cause stated in NJI2d Crim. 4.1.

Thomas argues that since the evidence shows that the injury sustained by White in the shooting was not life threatening and the cause of death was head trauma sustained during the car accident, the trial court should have given an instruction defining "efficient intervening cause." Brief for appellant at 30. An efficient intervening cause is a new and independent cause, itself a proximate cause of the death, which breaks the causal connection between the original illegal act and the death. *State v. Harris*, 194 Neb. 74, 230 N.W.2d 203 (1975).

The State argues that this case is similar to *State v. Ruyle*, 234 Neb. 760, 452 N.W.2d 734 (1990), in which the defendant was refused an instruction regarding efficient intervening cause. Ruyle claimed that the victim caused his own death by voluntarily reentering a building that had been set on fire by Ruyle. We found no issue of intervening cause and held that the jury was properly instructed. We concluded that a victim's contributory

negligence will not relieve a defendant from criminal responsibility for homicide unless it was the supervening and thus sole cause of death.

Whether jury instructions given by a trial court are correct is a question of law. *State v. Quintana*, 261 Neb. 38, 621 N.W.2d 121 (2001). In the present case, the evidence did not warrant an instruction on efficient intervening cause. The fact that White drove away at a high rate of speed was not a new and independent cause which broke the causal connection between the shooting and the death. Any contributory negligence on White's part, if it existed, did not relieve Thomas of criminal responsibility for the homicide unless White's actions were the sole cause of his death. See *State v. Ruyle, supra.*

The evidence established that White was shot by Thomas and that White then drove away at a high rate of speed, heading for a hospital. White said he could not make it to the hospital shortly before the car crashed into a building. White's actions were not the sole cause of his death, and they did not support an efficient intervening cause instruction. The trial court did not err in failing to give that instruction, and the jury was properly instructed on the issue of proximate cause.

Next, Thomas argues that the jury was not given an appropriate manslaughter instruction. Because the record does not suggest that Thomas requested a manslaughter instruction, the question is whether there was any evidence from which a jury could conclude that he committed manslaughter. "A person commits manslaughter if he kills another without malice, either upon a sudden quarrel, or causes the death of another unintentionally while in the commission of an unlawful act." Neb. Rev. Stat. § 28-305(1) (Reissue 1995).

Thomas claims that a jury could have found that he killed White upon a sudden quarrel because both Thomas and another witness testified that words were exchanged between Thomas and the occupants of White's vehicle. A sudden quarrel is a legally recognized and sufficient provocation which causes a reasonable person to lose normal self-control. *State v. Lyle*, 245 Neb. 354, 513 N.W.2d 293 (1994). The evidence does not support an inference that Thomas shot at White's car as the result of a sudden quarrel.

Thomas also claims that a jury could have found that he unintentionally killed White while in the commission of an assault on Petitphait. The record includes no evidence from which a jury could infer that Thomas intended to shoot at Petitphait but not at White. The assignment of error regarding the manslaughter instruction has no merit.

Thomas claims that he acted in self-defense and that the trial court erred in its self-defense instructions. The trial court gave two separate self-defense instructions. Thomas argues that a single " 'in concert' " instruction should have been given because the jury could have found that White and Petitphait were acting in concert to threaten Thomas. Brief for appellant at 34. He claims that if the jury believed, for example, that White threatened or attempted to cause Thomas' death and that Thomas had provoked Petitphait or vice versa, the instructions would not permit a finding of self-defense. Thomas testified that he shot at both White and Petitphait because he thought they were trying to kill him and he did not want to die; however, Thomas claimed that he did not want to be the cause of any death.

The jury instructions stated:

> The defendant acted in self-defense as to Phillip White if: One, Phillip White threatened or attempted death or serious bodily harm towards [sic] the defendant. And, two, the defendant did not provoke any such use of force against him with the intent of using deadly force and response. And, three, under the circumstances as they existed at the time, the defendant reasonably believed that his use of deadly force was immediately necessary to protect him against death or serious bodily injury — against death or serious bodily harm. And, four, before using deadly force, the defendant either tried to get away or did not try because he reasonably did not believe he could do so in complete safety.

> The fact that the defendant may have been wrong in estimating the danger does not matter so long as there was a reasonable basis for what he believed, and he acted reasonably in response to that belief.

> Deadly force means force used with the intent to cause death or serious bodily harm or force used with the knowl-

edge that its use would create a substantial risk of death or serious bodily harm.

The same instruction was given as to Petitphait.

Thomas claims that he was not trying to hit either White or Petitphait but that he was shooting in their direction because one or two of the car's occupants had a gun. In *State v. Owens*, 257 Neb. 832, 601 N.W.2d 231 (1999), the defendant fired shots into a vehicle and one of the occupants was killed. The defendant claimed he was entitled to a self-defense instruction regarding all of the occupants of the vehicle as a group. We stated that the language of Neb. Rev. Stat. § 28-1409(1) (Reissue 1995) makes it clear that the excuse of self-defense applies to the threatening behavior of another person, and not to a generalized group of actors. The self-defense instructions given in this case follow the language of NJI2d Crim. 7.2 and accurately state the law. Thomas' assignment of error as to the self-defense instructions is without merit.

Thomas also argues that he was entitled to an instruction on transferred intent like the one given in *State v. Duis*, 207 Neb. 851, 301 N.W.2d 587 (1981). In *Duis*, the defendant intended to shoot one person but actually killed another and was charged under a theory of transferred intent. Thomas was not charged under a theory of transferred intent, and therefore, he was not entitled to an instruction on transferred intent.

Thomas further claims that the jury should have been instructed that it could not change its decision. The jury was instructed that its "decision on these facts is final." When the jurors were individually polled following the verdict, each responded that he or she agreed with the verdict. We find no merit to this assignment of error.

### 3. PROSECUTORIAL MISCONDUCT

Thomas claims that he was denied a fair trial by several acts of prosecutorial misconduct. First, Thomas argues that the prosecutor promised leniency to Aybar Crawford in exchange for his testimony. On cross-examination, Thomas asked Crawford if he had received anything in return for his testimony, and Crawford denied that any promises had been made to him. During a break, the State informed Thomas that Crawford had a felony conviction

for which he had not been sentenced. On recross, Thomas questioned Crawford about leniency and Crawford said he could not benefit because he would be returned to California for probation violation. The State then asked if anyone had made any promises to Crawford, and he again denied that any promises had been made. Thomas argues that prosecutorial misconduct occurred when the prosecutor did not correct Crawford's denial of a deal in exchange for his testimony.

In support of his motion for postconviction relief, Thomas obtained a copy of a transcript that included hearings on Crawford's plea, sentence, and violation of probation. However, those documents are not part of the record before us on direct appeal and will not be considered. See *McCracken II* (appellate court is precluded from considering any portion of record that would not have been included in record on original direct appeal when considering merits of new direct appeal). This assignment of error has no merit.

Thomas also claims he was denied a fair trial because the prosecutor used improper rebuttal to bolster the credibility of Petitphait and the trial court admitted the evidence. Thomas made no timely motion for mistrial on this basis. Therefore, he has waived the right to assert on appeal that the trial court erred in failing to declare a mistrial due to prosecutorial misconduct. See *State v. Owen*, 1 Neb. App. 1060, 510 N.W.2d 503 (1993). This assignment of error has no merit.

Thomas next claims that he was denied a fair trial when the prosecutor made an improper argument in closing, when he said: "And now it's in your hands, ladies and gentlemen. We all should be sick and tired of the shooting, the random shooting that goes on and the violence that's going on. Now you have a chance to do something about it. Thank you very much." Thomas objected to the statement that the jury had "a chance to do something about it," and he asked for a cautionary instruction and a mistrial. On appeal, Thomas complains that the argument appealed to the jury to convict him as an expression of the conscience of the community rather than based on his actions.

The general rule is that remarks made by the prosecutor in final argument which do not mislead or unduly influence the jury do not rise to a level sufficient to require granting a mistrial.

*State v. Fraser*, 230 Neb. 157, 430 N.W.2d 512 (1988). Whether or not inflammatory remarks by a prosecutor are sufficiently prejudicial to constitute error must be determined upon the facts of each particular case. *State v. Tiff*, 199 Neb. 519, 260 N.W.2d 296 (1977). The trial court's refusal to give an admonishing instruction supports the inference that the court did not consider the prosecutor's argument to be of such a nature that it would have a damaging effect. This error has no merit.

The trial court also considered this issue in Thomas' motion for new trial and the first supplemental motion, when it concluded that in light of the cautionary instructions given at trial, the prosecutor's statement did not reach a degree of prejudice that would require a mistrial. The trial court is in a better position to measure the impact a comment has on a jury, and the court's decision will not be overturned unless clearly erroneous. *State v. Trackwell*, 244 Neb. 925, 509 N.W.2d 638 (1994), *disapproved on other grounds, State v. Koperski*, 254 Neb. 624, 578 N.W.2d 837 (1998). We find no error in the trial court's determination, and we find no merit to this argument.

Thomas next alleges that it was prosecutorial misconduct to strike the only minority member of the jury panel. As outlined earlier, Thomas did not meet his burden of proving that he was denied a fair trial based on *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). The State's actions in striking a Native American panel member do not rise to the level of prosecutorial misconduct. The prosecutor provided a legitimate reason for striking the panel member. We conclude there is no evidence to sustain Thomas' assignment of error.

Thomas also claims prosecutorial misconduct because the State called Det. Bill Jadlowski as a rebuttal witness and asked him about an out-of-court identification of Thomas made by Roger Tucker, a witness for the State. Thomas objected because he had already testified that he was the shooter. Thomas claims this question violated Canon 7, DR 7-106(C)(2), of the Code of Professional Responsibility, which states that a lawyer shall not "[a]sk any question that the lawyer has no reasonable basis to believe is relevant to the case and that is intended to degrade a witness or other person." There is no showing that the questions asked of Tucker were intended to degrade a witness or other

person. The trial court did not err in allowing this testimony on rebuttal because the testimony was cumulative to Thomas' own testimony and he was not prejudiced by it. Thomas has failed to establish any intentional wrongdoing or any prejudice in the State's questions concerning out-of-court identifications. We find no merit to this assignment of error.

## 4. EVIDENCE ISSUES

Concerning the admission of evidence, Thomas first argues that the trial court erred in refusing to allow him to cross-examine a witness as to the witness' address. Outside the presence of the jury, the State explained that the witness was reluctant to provide his address for fear of retaliation. Thomas stated that he did not need a specific address, but he wanted to know in which block the witness lived. The witness then testified that he lived in the area of 24th and Spencer Streets. Thomas apparently wished to establish that the witness lived near White and was associated with a gang. However, Thomas did not allege at trial and has not asserted on appeal any prejudice that resulted from the failure to obtain a specific address from the witness. Nor has Thomas suggested a specific rule of evidence which was violated by the trial court's refusal to require the witness to provide an address.

In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by the Nebraska Evidence Rules, not judicial discretion, except in those instances under the rules when judicial discretion is a factor involved in determining admissibility. Where, as here, the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. *State v. Lessley*, 257 Neb. 903, 601 N.W.2d 521 (1999). We find no abuse of discretion by the trial court as to this evidentiary issue.

Next, Thomas asserts that the court erred in admitting expert testimony on crush measurements and impact calculations regarding the damage to White's car. The standard for reviewing the admissibility of expert testimony is abuse of discretion. See *State v. Dean*, 246 Neb. 869, 523 N.W.2d 681 (1994), *overruled on other grounds, State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998).

██ The expert witness, David Carlson, an officer with the Omaha Police Department, testified that he has investigated serious personal injury and fatality accidents for 6 to 7 years. He testified that White's car left 24th Street just south of Patrick Avenue, hit a post, traveled through a cinder vacant lot, crashed through the concrete and brick wall of a building, and entered the building, stopping at a point 24 to 27 feet inside the building. Carlson stated that he can determine the speed of a vehicle from the skid marks and scuff marks on the roadway, or lack of such marks, and the "crush," or area on a vehicle that is pushed in from impact. Carlson estimated that the front end of White's automobile was crushed 24 to 30 inches, which equated to an impact speed of 40 to 50 m.p.h. At that time, Thomas did not object or move to strike Carlson's testimony. The State then asked Carlson his opinion of the speed of White's vehicle at the time of impact, and the trial court sustained Thomas' foundational objection. However, Carlson had already expressed his opinion about the speed of White's vehicle with no objection. A party waives the right to assert on appeal prejudicial error concerning the admission of evidence received without objection. *State v. Buechler*, 253 Neb. 727, 572 N.W.2d 65 (1998). This assignment of error has no merit.

### 5. HABITUAL CRIMINAL

Thomas asserts that the trial court erred in finding him to be a habitual criminal. He alleges that exhibits concerning convictions in 1984 and 1989 offered by the State do not support the sentence enhancement because the journal entries do not contain the judges' signatures. The State also offered certified copies of records showing (1) that Thomas was committed to the Department of Correctional Services on November 28, 1984, on two counts of second degree assault and was discharged on April 27, 1987, and (2) that Thomas was committed to the department on August 9, 1989, for attempted possession with intent to deliver a controlled substance (cocaine) and was released on May 27, 1993, to be discharged from parole effective June 27, 1994. The copies were certified by the records custodian of the department's central records office.

██ In a proceeding to enhance a punishment because of prior convictions, the State has the burden to prove such prior

convictions. *State v. Ristau*, 245 Neb. 52, 511 N.W.2d 83 (1994). The State cannot meet its burden of proof with a judgment that would have been invalid to support a sentence of imprisonment in the first instance. *Id.*, citing *Baldasar v. Illinois*, 446 U.S. 222, 100 S. Ct. 1585, 64 L. Ed. 2d 169 (1980), *overruled on other grounds, Nichols v. United States*, 511 U.S. 738, 114 S. Ct. 1921, 128 L. Ed. 2d 745 (1994). Under *Baldasar*, when using a prior conviction to enhance a sentence, the State need show only that at the time of the prior conviction, the defendant had, or waived, counsel. *State v. Ristau, supra.* In a proceeding for an enhanced penalty, the State has the burden to show that the records of a defendant's prior felony convictions, based on pleas of guilty, affirmatively demonstrate that the defendant was represented by counsel or that the defendant, having been informed of the right to counsel, voluntarily, intelligently, and knowingly waived that right. *State v. Nelson, ante* p. 896, 636 N.W.2d 620 (2001); *State v. Orduna*, 250 Neb. 602, 550 N.W.2d 356 (1996). In most cases, the State will prove a defendant's prior convictions by introducing certified copies of the prior convictions or transcripts of the prior judgments. *State v. Ristau, supra.* A transcript of a judgment which fails to contain an affirmative showing that the defendant had or waived counsel is not admissible and cannot be used to prove a prior conviction. *Id.* Thomas makes no claim that his pleas and convictions were uncounseled, nor does he assign the admission of the prior convictions as error.

■ The use of a defendant's prior convictions to enhance the defendant's sentence absent proof in the record that the prior convictions were obtained at a time when the defendant was represented by counsel or had knowingly waived such right is plain error. See *id.*

The record does not show that the trial court ascertained whether Thomas was represented by counsel or waived his right to counsel at the time of the earlier convictions. The journal entries simply show that Thomas was present with counsel at the time of sentencing, but they do not demonstrate whether he was represented by counsel prior to that time. The evidence offered by the State at the enhancement hearing did not establish that Thomas was represented by counsel or had waived the right to

counsel at the time of the prior convictions. We conclude that the evidence was insufficient to prove Thomas' earlier convictions for purposes of sentence enhancement.

 Double jeopardy does not attach to habitual criminal enhancement proceedings under Neb. Rev. Stat. § 29-2221 (Cum. Supp. 1994). *State v. Nelson, supra.* Because the evidence presented at the enhancement hearing did not establish that Thomas' prior felony convictions were counseled or that he properly waived his right to counsel, it was error for the trial court to find Thomas to be a habitual criminal. We therefore vacate Thomas' sentences and remand the cause to the trial court with directions for a new enhancement hearing and for resentencing following that hearing.

### 6. INEFFECTIVE ASSISTANCE OF COUNSEL

 Although an appellate court will not address an ineffective assistance of counsel claim on direct appeal when the matter necessitates an evidentiary hearing, such claims do not require dismissal ipso facto. *State v. Dunster, ante* p. 329, 631 N.W.2d 879 (2001). In order to sustain a claim of ineffective assistance of counsel as a violation of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution, a defendant must show that (1) counsel's performance was deficient and (2) such deficient performance prejudiced the defendant, that is, demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *McCracken II.* To prove ineffective assistance of counsel, the defendant must establish that his attorney failed to perform at least as well as a lawyer with ordinary training and experience in criminal law and must demonstrate how he was prejudiced in the defense of the case as a result of the attorney's actions or inactions. *State v. Clausen,* 247 Neb. 309, 527 N.W.2d 609 (1995).

Thomas claims a number of instances in which counsel allegedly failed to provide effective assistance.

### (a) Failure to Call Officer Warnock

Thomas claims the testimony of an Officer Warnock would have impeached the credibility of other witnesses for the State and that Thomas' counsel was ineffective in failing to call

Warnock. No reference to Warnock is contained in the trial record, but, rather, it is found in the record of the postconviction hearing. As noted earlier, the only record properly before us is the trial record. Because the record needed to support this assignment of error is not properly before the court, we cannot consider this assignment of error.

### (b) Failure to Object to Expert Testimony on Crush Measurements

The accident investigator, Carlson, testified that the crush measurements on White's vehicle translated into an estimated impact speed of 40 to 50 m.p.h. Petitphait testified that he thought White was traveling between 65 and 70 m.p.h. Although the speedometer was stuck at 70 m.p.h., Carlson testified that the speed at which the speedometer stopped is not an accurate indication of the speed at the time of the collision.

This assignment of error is without merit because Thomas has not established any prejudice based on the admission of Carlson's testimony. The exact speed of the vehicle was not a critical fact in Thomas' conviction. Evidence was undisputed that the car jumped a curb and crashed through a brick wall and that White died as a result of head injuries sustained in the crash. The speed at which White was traveling is not a vital element of the case.

### (c) Failure to File Motion in Limine to Exclude Testimony of Dr. Bowen Regarding Effect of Injury

The State called Dr. Robert Bowen, who performed an autopsy on White. While Bowen was unable to testify as to the extent of damage to the femoral artery caused by the gunshot, Bowen testified that there would have been significant bleeding if the femoral artery had been damaged. If significant bleeding occurs, the victim can lose consciousness. Thomas claims his counsel should have filed a motion in limine to exclude this testimony. We find this assignment of error to be without merit because Thomas has failed to show that he suffered any prejudice as a result of the testimony.

### (d) Failure to Identify Witnesses

Thomas alleges ineffective assistance of counsel because counsel did not ask the trial court to compel King to provide the

name of a companion who was with King when they followed the car in which the shooter left the scene. King had refused to identify his companion. Thomas offered Evans' sworn statement in support of Thomas' first supplemental motion for new trial. In the order denying that motion, the trial court determined that Evans' account differed from King's testimony concerning their activities earlier in the evening, regarding King's position at the time he made his observations of the shooting, and as to events after the shooting.

Evans stated that he and King were drinking beer in the filling station parking lot and were not paying attention to White's car until they heard four or five shots. King testified that he was driving down the street and saw a man run up to a car. Evans testified that King refused to change his statement when Evans challenged him. Evans stated that he and King had consumed between a 6-pack and a 12-pack of beer and possibly a half pint of brandy. Evans also admitted to smoking marijuana but did not recall whether King was smoking marijuana.

We conclude that Thomas has failed to show he was prejudiced by counsel's failure to obtain and offer Evans' testimony at trial. We cannot say that Thomas has demonstrated with a reasonable probability that the result of the proceeding would have been different if counsel had called Evans as a witness. Even if Evans' testimony had been offered at trial, Thomas admitted he was present at the time of the shooting and that he fired into the car four or five times. This error has no merit.

(e) Failure to Object to Causation Instruction and Request Appropriate Intervening Proximate Cause Instruction and Failure to Present Manslaughter Instruction

We have addressed these issues previously and found that the correct instructions were given. Therefore, Thomas has not shown that his counsel was ineffective for failing to object to the instructions given or to request different instructions.

(f) Failure to Elicit Testimony at New Trial Hearing

Thomas complains of his counsel's failure to elicit the testimony of the trial judge and the bailiff at the hearing on the second supplemental motion for new trial. We have found no error in the overruling of this motion for new trial and find no prejudice to

Thomas in his counsel's failure to elicit certain testimony at the hearing on that motion. This assignment of error has no merit.

### (g) Failure to Object at Enhancement Hearing

We have concluded that the evidence was insufficient to support a finding that Thomas is a habitual criminal and therefore have vacated the sentences and remanded the cause with directions for a new enhancement hearing and for resentencing. We decline to further consider this assignment of error.

### (h) Failure to Move to Strike Testimony of King and Crawford for Refusing to Answer Material Questions on Cross-Examination

We have addressed the issue of King's testimony and will not consider it further as it relates to ineffective assistance of counsel. As to Crawford's testimony, Thomas has not set forth any prejudice as a result of the testimony or any material questions Crawford refused to answer on cross-examination. Crawford repeatedly testified that he could not remember the names of the people who were with him. We conclude that Thomas has failed to prove that he suffered any prejudice from the performance of his attorney in failing to move to strike Crawford's testimony.

### 7. POSTCONVICTION ISSUES

Thomas asserts three errors by the trial court related to the motion for postconviction relief. On May 9, 2001, this court sustained the State's motion for summary dismissal of Thomas' appeal from the postconviction proceeding, and those issues relating to postconviction are not properly before this court. Thus, they will not be considered.

## VI. CONCLUSION

Having found no merit to Thomas' assignments of error except with regard to the sufficiency of the evidence to support a finding that Thomas is a habitual criminal, we affirm the judgment of conviction. However, Thomas' sentences are vacated, and the cause is remanded with directions for a new enhancement hearing and for resentencing.

AFFIRMED IN PART, AND IN PART SENTENCES VACATED
AND CAUSE REMANDED WITH DIRECTIONS.

McCORMACK, J., participating on briefs.